UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNELL JOHNSON,

        Plaintiff,

v.

WASHTENAW COUNTY, MARK
NEUMANN, and SCOTT HEDDLE

        Defendants.

Case No.  24-12701
Judge:

_____

SHEREEF H. AKEEL (P54345)
HASAN KAAKARLI (P81099)
SAMUEL R. SIMKINS (P81210)
Akeel & Valentine, PLC
Attorneys for Plaintiff
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084-4736
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
hayden@akeelvalentine.com

_____

## PLAINTIFF'S COMPLAINT

**NOW COMES** Plaintiff, RONNELL JOHNSON, by and through his

undersigned counsel, AKEEL & VALENTINE, PLC, and for his Complaint against

Defendants, states as follows:

## INTRODUCTION

1.     Ronnell Johnson ("Plaintiff" or "Mr. Johnson") was incarcerated for almost 18 years for a crime he did not commit. While Mr. Johnson was recently exonerated and his freedom restored, the deprivation of that freedom for nearly two decades was not simply an unfortunate example of the criminal justice system making an honest mistake. This wrong was entirely avoidable and caused only because Defendants violated Mr. Johnson's due process rights by withholding exculpatory information.

2.     On March 30, 2007, around 6:50 am, four suspects—whose identities remain unknown—robbed Mr. Bubbles Car Wash in Ypsilanti Township and its owner, Mark Elker, at gun point.

3.     While two of the suspects remained outside as lookouts, security camera footage from inside the carwash captured two of the suspects, both of whom were wearing masks.

4.     Given the location of the robbery, this case was under the jurisdiction of the Washtenaw County Sheriff's Department ("WCSD").

5.     At the time, there had been a string of robberies in the area that had gone unsolved—including an earlier robbery of that same car wash. This created significant pressure on law enforcement to identify a suspect.

6.     Seven days after the robbery, on or around April 6, 2007, with no suspects, persons of interest, or leads, the WCSD released the security footage to

local news media asking for the public's help in identifying either of the two suspects in the video.

7.     On or around that same day, Mr. Johnson's estranged father, Ronald Johnson ("Ronald"), allegedly saw a news report playing the security footage and claimed to have identified one of the suspects as Mr. Johnson.

8.     On April 7, 2007, Ronald allegedly called the WCSD and stated that he believed Mr. Johnson to be one of the suspects. Shortly thereafter, Defendant Scott Heddle met with Ronald at his home to discuss Ronald's purported identification of the suspect.

9.     Based entirely on Ronald's spurious identification of Mr. Johnson as a suspect, Defendant Heddle sought and received a warrant to search Mr. Johnson's home that same day. Defendant Heddle was present during the execution of the search warrant.

10.     Also on April 7, 2007, Mr. Johnson was arrested and taken into custody by WCSD and interrogated as a suspect by Defendant Mark Neumann.

11.     Felony charges for armed robbery were eventually brought against Mr. Johnson. Following a preliminary examination in October 2007, where Ronald's testimony was the only basis for probable cause, Mr. Johnson was bound over on felony charges.

12.    Despite the complete lack of physical evidence implicating Mr. Johnson, the case continued to trial where Ronald's testimony was the cornerstone of the State's case.

13.    Unbeknownst to Mr. Johnson, but very much known by the Defendants, Ronald was facing his own legal troubles.

14.    On January 12, 2007, Ronald was charged with two counts of felonious assault with a dangerous weapon after threating to shoot two people, including a WCSD detective, with a pellet gun. **Exhibit A – Ronald Johnson Complaint.**

15.    Given Ronald's criminal history—which included a prior involuntary manslaughter conviction—he faced up to six years in prison on each count. **Exhibit B – Habitual Offender Notice.**

16.    One month after Ronald offered WCSD a much needed suspect by implicating Mr. Johnson, the prosecution allowed Ronald to take a nolo plea to a misdemeanor charge and agreed to dismiss the felony charges at sentencing. Video of Plea Hearing, 5/3/07[1] at 1:40 to 4:33; *see also* **Exhibit C – Amended Information, 5/8/07**.

---

[1] This plea hearing video has also been uploaded as a private/unlisted file on YouTube, and it can be accessed at: https://bit.ly/34TFkVC.

17.     In June 2007, Ronald was sentenced to 18 months of probation. Video of Sentencing Hearing, 6/7/07[2] at 0:40. The prosecution dismissed the original felony charges that same day. **Exhibit D – Dismissal Order Re: Ronald Johnson**.

18.     Despite initially facing up to six years in prison, Ronald ultimately received a plea deal that resulted in him avoiding prison altogether. Although Ronald testified at Mr. Johnson's preliminary examination in October 2007, and at Mr. Johnson's trial in March 2008, Ronald's recent plea deal was not disclosed to Mr. Johnson's defense. **Exhibit E – Affidavit of Trial Counsel Kingsley Arimah.**

19.     In 2015, the Michigan Innocence Clinic ("MIC") became involved and started looking at Mr. Johnson's case. Through great effort, MIC discovered that the prosecution had failed to disclose that Ronald received such a favorable and lenient plea deal after cooperating with WCSD and implicating Mr. Johnson, despite this information being known to Defendants.

20.     Mr. Johnson was eventually able to seek post-conviction relief and filed a motion for relief from the judgment.

21.     In joining Mr. Johnson's motion for post-conviction relief to vacate the criminal verdict against him, the Washtenaw County Prosecutors Office conceded

---

[2] This sentencing video has also been uploaded as a private/unlisted file on YouTube, and it can be accessed at: https://bit.ly/3K9ZE5c.

that Mr. Johnson's conviction was premised on a Brady violation. **Exhibit F –**
**Prosecutor's Response.**

22.    Plaintiff was set free approximately 17 years and 6 months after he was
first wrongfully imprisoned.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343; 42
U.S.C. § 1983.

24.    This Court has personal jurisdiction over the named Defendants
because they either reside in the State of Michigan and/or do systematic and
continuous business in Michigan.

25.    Venue lies in the Eastern District of Michigan, Southern Division,
pursuant to 28 U.S.C. § 1391(b) because the events that support Plaintiff's
allegations occurred in this district and because the Defendants reside in this district.

## PARTIES

26.    Plaintiff, Ronnell Johnson, is a resident of Washtenaw County, State of
Michigan.

27.    Defendant, Washtenaw County, is a political subdivision of the State of
Michigan duly organized to carry out governmental functions under the laws of
Michigan, one of the functions being to create and implement policies and practices,

and to organize, operate, staff, and supervise its sheriff's deputies and prosecuting attorneys.

28.     Defendant, Mark Neumann, was employed by the WCSD as a Detective.  Neumann was the Officer in Charge of the Mr. Bubbles Robbery. Upon information and belief, Neumann also had knowledge of Ronald's felonious assault charges.[3] Based on the record, Neumann did not inform Mr. Johnson or the court about the lenient plea deal that Ronald was given. Additionally, Neumann was fully aware of the importance of Ronald's credibility and the many factors weighing against that credibility, including that Ronald was Mr. Johnson's estranged and abusive father, the complete lack of physical evidence implicating Mr. Johnson, the numerous inconsistencies in Ronald's testimony, and how several family members who lived with Mr. Johnson testified that he was not the suspect. As such, Detective Neumann understood how the entire case came down to Ronald's credibility and yet failed to disclose a key fact that significantly implicates Ronald's motive and credibility.

29.     Defendant, Scott Heddle, was employed by the WCSD as a Sheriff's Deputy. Heddle was the first officer on scene at the Mr. Bubbles Robbery and

---

[3] Disturbingly, in questioning Mr. Johnson, Defendant Neumann described the very charges against Ronald without revealing this exculpatory information: "Do you know what a felonious assault is? You ever get charged with that? Okay, you know if you point a gun at somebody that's called felonious assault?" Interrogation of Ronnell Johnson, April 7, 2007, 13:49-13:55

continued to work on the case, including interviewing Ronald at his house. Upon information and belief, Heddle also had knowledge of Ronald's felonious assault charges. Based on the record, Heddle did not inform Mr. Johnson or the court about the lenient plea deal that Ronald was given. Additionally, Heddle was fully aware of the importance of Ronald's credibility and the many factors weighing against that credibility, including that Ronald was Mr. Johnson's estranged and abusive father, the complete lack of physical evidence implicating Mr. Johnson, the numerous inconsistencies in Ronald's testimony, and how several family members who lived with Mr. Johnson testified that he was not the suspect. As such, Deputy Heddle understood how the entire case came down to Ronald's credibility and yet failed to disclose a key fact that significantly implicates Ronald's motive and credibility.

30.     Defendants Mark Neumann and Scott Heddle are herein collectively referred to as the Officer Defendants.

31.     Officer Defendants also had a photo of Plaintiff before the incident and never concluded that that photo matched any of the individuals depicted in the security camera.

## COMMON ALLEGATIONS

32.     Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

**The Crime and Arrest**

33.     In the early morning hours of March 30, 2007, Mr. Johnson was at home, with his mother, Arnita Baskin ("Ms. Baskin").

34.     At the same time, on the other side of town, a group of four men—whose identities remain unknown—robbed Mr. Bubbles Car Wash and its owner, Mark Elker, at gun point.

35.     While two of the suspects remained outside (presumably as lookouts) two men entered the office where Mr. Elker was and were caught on the security camera inside the office.

36.     This came at a time when there was an increase in unsolved armed robberies in the area, creating significant public pressure on the WCSD to crack down on crime.

37.     Defendant Neumann even admitted to such when interrogating Mr. Johnson: "We've had a lot of armed robberies all over town." Interrogation of Ronnell Johnson, 04/07/07, 16:08. And again stating: "These things are going on all around town. There's a million of them." *Id.* at 20:08-20:12

38.     Defendant Heddle was on duty at the time of the robbery and responded to the 911 call.

39.     Unfortunately, WCSD did not recover any actionable evidence from the scene.

40. Both of the suspects who were seen on the security camera footage had masks covering most of their faces.

41. Mr. Elker testified that as soon as he realized what was happening, he intentionally kept his gaze away from the assailants so that they would not think he was trying to identify them. He told police that his goal was survival, not identifying the suspects. He was unable to identify any perpetrators or offer useful eyewitness testimony.

42. After a week without any leads, persons of interest, or suspects, pressure was building for the WCSD to solve this case. In response to this pressure, on or around April 6, 2007, WCSD released the security camera footage to the local media, asking the public for help in identifying either suspect.

43. According to Ronald's uncorroborated account, he saw the footage played on the news that same day. Although the robbery suspect was wearing a mask that covered his face from the nose down, and Ronald remained estranged from Mr. Johnson, Ronald insisted that the unidentified man was in fact Mr. Johnson.

44. Based entirely on Ronald's identification, the police arrested Mr. Johnson and searched his home.

45. Mr. Johnson unwaveringly maintained that he was innocent. No physical evidence was ever uncovered or presented to affirmatively connect Mr. Johnson to the crime.

**Ronald's Arrest and Plea**

46.     Unbeknownst to Mr. Johnson and his defense team, Ronald was facing felony charges of his own, which were also brought by WCSD.

47.     On January 12, 2007, Ronald was charged with two counts of felonious assault with a dangerous weapon after threating to shoot two people, including a WCSD detective, with a pellet gun. **Exhibit A – Ronald Johnson Complaint**

48.     Given Ronald's criminal history—which included a prior involuntary manslaughter conviction—he faced up to six years in prison on each count. **Exhibit B – Habitual Offender Notice**

49.     One month after Ronald offered WCSD a much-needed suspect by implicating Mr. Johnson, the prosecution allowed Ronald to take a *nolo* plea to a misdemeanor charge and agreed to dismiss the felony charges at sentencing. Video of Plea Hearing, 5/3/07[4] at 1:40 to 4:33; *see also* **Exhibit C - Amended Information, 5/8/07**.

50.     In June 2007, Ronald was sentenced to 18 months of probation. Video of Sentencing Hearing, 6/7/07[5] at 0:40. The prosecution dismissed the original felony charges that same day. **Exhibit D - Dismissal Order Re: Ronald Johnson**.

---

[4] This plea hearing video has also been uploaded as a private/unlisted file on YouTube, and it can be accessed at: https://bit.ly/34TFkVC.
[5] This sentencing video has also been uploaded as a private/unlisted file on YouTube, and it can be accessed at: https://bit.ly/3K9ZE5c.

51. Despite initially facing up to six years in prison, Ronald ultimately received a plea deal that resulted in him avoiding prison altogether.

52. This information, despite it being within Defendants custody and control, was never turned over to Mr. Johnson's defense team.

**Defense Motion Seeking Criminal Background Information**

53. On February 5, 2008, Mr. Johnson's criminal defense attorney, Kingsley Arimah, filed a motion seeking LEIN information for the prosecution's witnesses. On February 13, 2008, the court held a hearing on this discovery request. After finding that a defendant is not entitled to the full LEIN information, the court quoted controlling case law to note that "the prosecutor has an obligation to turn over information regarding a witness's criminal background that would be beneficial to the defendant, and that the prosecutor otherwise has in their file."[6] Hearing Video at 4:24 to 4:34. In other words, the court acknowledge that the prosecution's obligations under *Brady* still applied.

**The Evidence At Trial**

54. Defendants and the prosecution failed to disclose Ronald's plea deal despite the fact that Ronald served as the prosecution's primary witness and that

[6] This hearing video has been posted as a private file on YouTube, and it can be accessed at this link: https://bit.ly/3Ibu19J.

Ronald's file was in the Defendants' custody. In fact, without Ronald's testimony, the prosecution would not have had a case.

55.    Ronald testified that he was certain that the man in the security footage was Mr. Johnson.

56.    Because Ronald's identification was so central to the prosecution's case, his credibility and motives became a central issue of the trial. In closing, the prosecution reiterated Ronald's certainty and assured the judge that Ronald "was not a person who came to court with any agenda." Trial Tr. 3/24/08, 101.

57.    Ronald's testimony was the bulk of the State's case. The only other inculpatory witness was Ronald's sister (Mr. Johnson's aunt), Cynthia Fort. Ms. Fort testified at trial that the security footage showed "a tape of [her] nephew," Trial Tr. 3/21/08, 102, but her testimony was inconsistent. Ms. Fort initially testified that Ronald arrived at her house with the taped security footage and told her he had, "just taped Ronnell on TV." Trial Tr. 3/21/08, 103. After further questions from the prosecutor, Ms. Fort contradicted her earlier testimony and said that Ronald had actually not mentioned Mr. Johnson's name before showing her the footage.

**Ronald's Credibility and Motive**

58.    Ronald is Mr. Johnson's biological father, but he did not raise Mr. Johnson. In fact, Mr. Johnson did not live with Ronald anytime after the age of five

because Ronald was abusive. From then until Mr. Johnson's arrest, Ronald saw his son only occasionally.

59.    Shortly before Mr. Johnson's arrest, Ronald had been ordered to pay the child support that he owed to Ms. Baskin.

60.    The footage used by Ronald to identify Mr. Johnson was grainy and unclear.

61.    At trial, there was significant debate about whether a coat found in Mr. Johnson's home matched the coat worn by the suspect in the video footage. The defense pointed out that the suspect's coat had a white patch on its front and that the coat found at Mr. Johnson's house had an additional zipper pocket on the left arm sleeve. The prosecution used the graininess to its advantage by arguing that, in the one instance, the white patch identified by the defense might have just been a glare, while on the other hand, the lack of visible arm zipper could be attributed to the low quality of the footage and the angle of filming. The court even noted that "given the … graininess of the tape and the photos, it's difficult to" draw conclusions about the coat. Trial Tr. 3/24/08, 134.

62.    There were other glaring holes in Ronald's testimony.

63.    For example, Ronald told Defendants Neumann and Heddle that he recognized the suspect as Mr. Johnson by the suspect's gloves and blue bandana worn around his arm. Ronald told the Defendants that Mr. Johnson had stolen

Ronald's driving gloves from him, and he recognized the gloves worn by the suspect as the same ones. Ronald also explained that these driving gloves were fingerless.

64.     However, closer examination of the footage revealed that the gloves worn by the suspect were not fingerless and were in fact Franklin baseball batting gloves.

65.     Further, despite Ronald's account of the footage, no bandana is found around the suspect's arm.

66.     Ronald's motive for implicating Mr. Johnson was a significant trial issue and the judge started his verdict by addressing it head on and stating:

> The trial has taken on kind of an interesting, almost surreal character during the trial with regard to some underlying issues involving the parents of the defendant. In perhaps – not that it's necessary, one answer to Mr. Arimah's question as to why would the defendant's father present this information to the police. Well, there certainly is a disparity in the testimony. … I suppose my only response would be something having heard very recently in church. Abraham decided to give up his son, Isaac, to God. There's any number of reasons why an individual may give up their child. In order to prevent them from perhaps being killed by law enforcement trying to apprehend them, perhaps because they see them going down the wrong path and they have no way of doing it.

Trial Tr. 03/24/08, 130-31.

67.     Ronald's motive was front and center, but the defense never got to present (and the court never got to consider) the strongest piece of evidence elucidating his motive: self interest in getting his felonious assault charges dismissed by provided the WCSD with a suspect.

**Lack of Physical Evidence**

68.     The entire weight of the verdict rested on Ronald's testimony as there was a complete lack of physical evidence linking Mr. Johnson to the crime.

69.     As mentioned above, there were obvious and unmitigated discrepancies regarding the coat and gloves: Mr. Johnson's coat did not have a white patch on the chest and had an extra zipper pocket on the sleeve, while the gloves that Ronald supposedly recognized from the footage were in fact Franklin baseball gloves, not the fingerless driving gloves that Ronald said they were.

70.     Additionally, Mr. Johnson's coat and the gun found at his house were sent to a lab for testing by Defendants and revealed no connection to the crime. This should have been surprising to Defendants because the crime scene was covered in blood splatter, as the suspects repeatedly hit him with the gun held by one of the suspects.

71.     Further, the "mask" found at Mr. Johnson's home that Defendants tried to connect to the crime was in fact, and obviously so, a knee brace, not a mask.

72.     As the court recognized, "given the … graininess of the tape and the photos, it's difficult to" draw conclusions about the coat. Trial Tr. 3/24/08, 134.

73.     Regarding the gun found at Mr. Johnson's house, the judge held "I do not believe beyond a reasonable doubt that the gun that was found on the premises

where the defendant lives is, in fact, the gun that was used in the robbery, or more specifically is the gun belonging to the defendant." Trial Tr. 3/24/08, 138.

74.    In the footage, the suspect assumed to be Mr. Johnson by the Defendants was not even the one holding a gun.

**Obvious Height Discrepancy**

75.    Mr. Johnson is 6'1" tall. This was known by Defendants since day one as it was recorded in the police report after Mr. Johnson was arrested and booked by WCSD.

76.    However, based on undisputed analysis of the video footage, the suspect that was identified by Defendants as Mr. Johnson was only 5'9" with shoes on. **Exhibit G – Photogrammetric Determination of Height**

77.    The doorway that the suspect walked through in the footage is less than 7 feet tall. Thus, the difference between someone 5'9" and someone 6'1", relative to the doorframe is obvious.

78.    Further, during the trial, the victim, Mr. Elker, testified to being 6' tall and that both of the perpetrators inside the car wash during the robbery were *shorter* than him. Trial Tr. 3/21/08, 61

79.    Nevertheless, Defendants ignored this obvious disparity and blindly pursued Mr. Johnson as their only suspect.

**Demonstrated Bias Against Mr. Johnson**

80. After Ronald allegedly called the WCSD to implicate Mr. Johnson, Defendants all but abandoned pursuing any other leads.

81. Despite the robbery being carried out by four, highly coordinated perpetrators, Defendants never developed any other leads or suspects, and especially none connected to Mr. Johnson.

82. Rather than insisting on working to find all perpetrators—the real ones—Defendants counted it a victory to have one person to prosecute, albeit not even the one accused of assaulting the victim.

83. From April 7, 2007, forward, Defendants had already made up their mind that Mr. Johnson was their perpetrator.

84. Defendants arrived at Mr. Johnson's home accompanied by a SWAT team, arrested him, and interrogated him that evening.

85. From the beginning of the interrogation, Defendant Neumann made it clear that Mr. Johnson is and would remain his suspect, no matter what the evidence indicated.

86. Defendant Neumann told Mr. Johnson "We've come to the point now where we know that that was you, okay, the other person. Now listen, this is serious, … this is what I also saw, alright, you didn't have a gun, you weren't the one hitting the guy, you weren't the one that seemed to be in command of what was going on

down there. … There's oblivious more than just you. … Somebody is going to rise to the top, alright, out of all of you. And right now, you're the one who's hit the most. Why? Because we know exactly that you were there." Interrogation of Ronnell Johnson, 04/07/07, 11:27-12:18.

87.    Two minutes later, in response to Mr. Johnson stating that the police will find out he was not involved, Defendant Neumann stated "I already found out. We're past that point. Understand what I'm saying … We're already past 'was that you at the carwash.'" *Id.* at 13:31-13:45

88.    Defendant Neumann again admitted that he was done investigating whether Mr. Johnson was in fact involved in the crime: "I don't need to figure out whether or not you were at Mr. Bubbles, and you were involved in that thing. I don't need to figure that out. That's already done." *Id.* at 19:42-19:49.

89.    Rather than fulfilling their duty to thoroughly investigate, weigh the evidence, think critically about motives and competing accounts, and provide Mr. Johnson with the presumption of innocence, Defendants took the inconsistent account of an estranged and abusive father and ran full speed ahead.

90.    In noting a difference in the sideburns and hairline between Mr. Johnson and the suspect 2, Defendant Neumann simply assumed that this was done by Mr. Johnson to alter or disguise his hairline, rather than as evidence that Mr. Johnson was not the suspect. Trial Tr. 3/24/08, 63-65.

91.    In addition to Defendants not engaging any identification expert or analysis, Defendants did not provide any voice identification analysis for the victim.

**Plaintiff Suffered a *Brady* Violation When  Defendants and Prosecutor Failed to Disclose Material Evidence that Ronald Received a Favorable Plea.**

92.    It is undisputed that Mr. Johnson's *Brady* rights were violated. After Mr. Johnson discovered that Defendants had withheld crucial and exculpatory information, the State conceded that *Brady* was violated.

93.    On April 15, 2022, in response to Mr. Johnson's motion for post-conviction relief, the Washtenaw County Prosecutor ("WCP") filed a response, joining Mr. Johnson's request and conceding that a *Brady* violation occurred in Mr. Johnson's criminal conviction. **Exhibit F – Prosecution's Response**

94.    In this response, the WCP noted that, consistent with the caselaw, law enforcement is required to disclose (1) "all plea agreements entered into by the government … with any witness the government intends to call," and (2) "any favorable dispositions of criminal charges pending against witnesses the prosecution intends to call." Prosecution Response at 14.

95.    Of Ronald's charges and plea, the WCP wrote "The existence of those pending charges could well have been used by defense counsel to impeach Ronald's testimony. Defense counsel could have highlighted the Ronald—facing a return to prison as a habitual offender—**had every incentive to curry favor with law**

**enforcement by identifying his son as the perpetrator**." *Id.* at 15 (emphasis added).

96.     WCP admits that it was well within its ability to obtain and disclose this information.

97.     To make matters worse, the WCP admits that Ronald's case file was later "purged." Thus, while alleging a *quid pro quo* is not necessary, the spoliation of this evidence leads to the strong inference of a *quid pro quo* as "Ronald *in fact* received a favorable plea deal just weeks after he identified [Mr. Johnson] as the culprit." *Id.*

98.     The WCP further conceded that, given "the state of the evidence at trial, defense counsel's inability to impeach Ronald Johnson was prejudicial." *Id*. at 18

99.     As the WCP explains, "to the Court, the only issue was one of identity." And, "There was no direct physical evidence linking Ronnell Johnson to the crime, and most of the circumstantial physical evidence—specifically the jacket and the firearm—were highly contested and did not weigh heavily in the Court's ruling. **The case rested, therefore, almost exclusively on testimony be [Mr. Johnson's] father**, Ronald, and his aunt identifying him as the perpetrator. *Why* a father would turn in his son was a major issue in the case—indeed, the Court referenced Ronald's motivations repeatedly when providing its verdict." *Id.* at 19 (first emphasis added).

100.   Further, "The Court questioned why [Mr. Johnson's] father presented evidence to the police and concluded that 'there are any number of reasons why an individual may give up their child.' And yet, **because the People suppressed evidence of Ronald's criminal history**, absent among the reasons this Court listed was the possibility that Ronald had motivations for his own well-being over [Mr. Johnson's]." *Id*. (emphasis added).

101.   This was not a harmless error. "Had a reasonable trier of fact learned that (1) Ronald was facing serious criminal charge when he identified his son; and (2) those charges were resolved via a plea soon after Ronald identified Defendant, the outcome of the case may well have been different. That information may have led reasonable trier of fact to make a different determination on the basis of all of the credibility concerns around Ronald Johnson taken as a whole." *Id*.[7]

### *Washtenaw County's Customs and Policies that Led to Plaintiff's Wrongful Conviction*

102.   Defendant Washtenaw County is legally responsible for implementing what *Brady* and *Napue*[8] require and monitoring staff compliance.

---

[7] The WCP also explained that this same evidence could have been used to impeach the testimony of Ronald's sister, Cynthia Fort: "Had the defense been afforded the opportunity to impugn Ronald's motivations for identifying his son, the defense could have also explored whether Ronald—motivated by a desire to avoid a prison sentence—had pressured or influenced his sister to identify Defendant as well." *Id.* at 20

[8] *Napue v. People of State of Ill*., 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

103.   Defendant Washtenaw County is liable for their failures to do so.

104.   Before, during, and after April 7, 2007, the date of Plaintiff Ronnell Johnson's arrest, Washtenaw County, by and through its final policymakers, had customs and policies to authorize, condone, tolerate, and approve illegal and unconstitutional actions by its deputies, detectives, police officers, investigators, taskforce members, and command staff.

105.   The illegal and unconstitutional actions and practices included, but were not limited to:

    a.   Conducting inadequate investigations into serious felony cases, such as armed robbery, in order to expeditiously close cases, and affirmatively choosing not to develop or pursue actual leads or evidence;

    b.   Conducting inadequate investigations into serious felony cases such as armed robbery and crimes with a weapon simply to close cases and in the process, choosing to ignore, not develop, and not pursue actual leads or evidence;

    c.   Knowingly and deliberately ignoring evidence that contradicts inculpatory witnesses in order to manufacture probable cause to arrest and/or strengthen a case for conviction;

    d.   Knowingly and deliberately withholding exculpatory evidence in order to manufacture probable cause to arrest and/or strengthen a case for conviction;

    e.   Knowingly tolerating *Brady* violations committed by their investigators, officers, and/or staff to improve conviction rates on felony cases;

    f.   Failing to have policies and procedures in place, and/or by failing to supervise or train employees as to policies and procedures, and/or by failing to attend to such policies and procedures to ensure that

exculpatory and impeachment evidence is provided to prosecutors and defense attorneys to prevent wrongful convictions;

g. Failing to sanction or discipline police officers, deputies, investigators, and other employees, including the Defendants in this case, who concealed violations of the constitutional rights of citizens by others and themselves, thereby causing and encouraging others, including the Defendants in this case, to engage in unlawful and unconstitutional conduct;

h. Failing to train initially and periodically and require police officers, deputies, investigators, and other employees to follow constitutional precedent and legal guidelines in the detention and questioning of individuals;

i. Condoning and/or encouraging an atmosphere of illegal activity by police officers, deputies, investigators, and other employees when dealing with the public, including criminal suspects;

j. Failing to supervise their police officers, deputies, investigators, and other employees;

k. Failing to include in their reports relevant factual information which would tend to contradict witness statements made and/or the contradictory witness statements themselves; and

l. Knowingly and deliberately choosing not to conduct formal tests and identification procedures because investigators knew that the results would contradict evidence against their target suspect.

106. Defendant Washtenaw County, through their final policymakers, further maintained customs and policies of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including their duty to disclose apparent exculpatory and impeachment evidence.

107. Washtenaw County's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of tis citizens, including Plaintiff Ronnell Johnson, and were the moving force behind the constitutional violations.

108. Defendant Washtenaw County's acts committed against Plaintiff Ronnell Johnson by their officers, deputies, investigators, and agents were committed intentionally, maliciously, unlawfully, wantonly and willfully, without any probable cause or legal justification.

109. Due to the conduct of the Defendants, as set forth below, Plaintiff Ronnell Johnson suffered the following injuries and damages:

    a.  Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of nearly eighteen years;

    b.  Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with felony armed robbery, facing a significant prison sentence; and being wrongfully convicted of crimes the Defendants knew he did not commit;

    c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d.  Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for felony murder;

    e.  Loss of enjoyment of daily activities including, but not limited to, seeing his children grow up;

    f.  Not being able to attend the funerals of family members;

g.  Physical injuries in prison;

h.  Loss of employment opportunity, past income, and future earning capacity;

i.  Loss of his close relationship;

j.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k.  Many of Plaintiff Ronnell Johnson's injuries and damages are likely to be permanent; and

l.  Other damages which may be revealed through discovery.

110.  Due to the conduct of Defendants, as set forth herein, the true perpetrators have never been charged or convicted with the crime, and the victim has never received true closure.

111.  Upon information and belief, Defendants engaged in this unconstitutional action or inaction, attempting to ensure that Mr. Johnson was convicted despite knowing that Mr. Johnson was innocent.

112.  As a direct and proximate result of the wrongful acts and omissions of Defendants, Plaintiff sustained damages.

113.  The Defendants Neumann and Heddle, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated in pertinent part: "As a sworn police officer, my fundamental duty is to serve the community; to safeguard

lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice." **Exhibit H** – Law Enforcement Code of Ethics.

114. Defendants, knowing that exculpatory and impeachment evidence existed before Mr. Johnson's criminal trial, suppressed the exculpatory evidence and ensured that Mr. Johnson, an innocent man, was sentenced to prison.

115. The Defendants Neumann and Heddle, experienced, well-trained police officers who took an oath to protect citizens' constitutional rights, knowingly deprived Mr. Johnson of his constitutional rights under the 4th Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation…"

116. Defendants knew their decision to suppress exculpatory evidence from Mr. Johnson ran afoul to the United States Supreme Court's recognition of the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 1077, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring).

117. Defendants also made a conscious, knowing, and intentional choice not to reveal exculpatory evidence to Mr. Johnson.

118.   Defendants either did not bring the exculpatory evidence to the prosecutor's attention, or Defendants conspired with prosecutors to suppress the evidence from Mr. Johnson.

119.   Since Defendants knew of the information regarding Ronald's criminal charges and plea deal, Defendants made a conscious, knowing, and intentional and/or reckless choice to ensure the information was not disclosed to Mr. Johnson before his trial.

120.   As a result of Defendants' conduct, Mr. Johnson spent over 17 years wrongfully imprisoned for a crime he did not commit.

## COUNT I

### *Brady* Violation
### Violations of the 14th Amendment Under 42 U.S.C. § 1983
### By Defendants Neumann and Heddle

121.   Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

122.   The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

123.   Suppression of material evidence favorable to the accused violates due process, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194 (1963).

124.   Defendants conspired to and/or withheld exculpatory or impeachment evidence, including, but not limited to, the fact that the prosecutions main witness, Ronald Johnson, was charged with felonious assault merely three months before implicating Mr. Johnson and that Ronald received an extremely favorable plea deal only one month after implicating Mr. Johnson.

125.   Defendants never presented any of this suppressed evidence during Mr. Johnson's trial, as required by law.

126.    If Mr. Johnson's trial attorney had this evidence at the time of trial, they would have introduced them, consistent with the defense strategy.

127.   Defendants knowingly violated their duties to disclose to Mr. Johnson all material evidence since their exculpatory and impeachment value were apparent.

128.   This evidence was obviously favorable to Mr. Johnson because the evidence would have demonstrated that Ronald was motivated by self-interest to curry favor with the very same department that was bringing charges against him.

129.   The evidence was material because "there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding

would have been different." *People v. Chenault*, 495 Mich. 142, 150, 845 N.W.2d 731, 735 (2014).

130.   Defendants' suppression of this evidence caused Mr. Johnson to suffer prejudice because there is a reasonable probability that the suppressed evidence would have produced a different verdict.

131.   Had Defendants disclosed the *Brady* material, there would have been a conviction.

132.   A re-trial that included the *Brady* evidence would result in a directed verdict or acquittal.

133.   The *Brady* evidence cited above would have been apparent to any reasonable officer acting in good faith.

134.   Mr. Johnson's right to be provided with material exculpatory and impeachment evidence was clearly established long before Mr. Johnson was investigated and arrested.

135.   The *Brady* violations committed by Defendants resulted in Mr. Johnson not receiving a fair trial, i.e., a trial resulting in a verdict worthy of confidence.

**WHEREFORE**, Plaintiff requests this Honorable Court award judgment against Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan,

in addition to punitive damages, reasonable attorney fees under 42 U.S.C § 1988, costs, and interest, and such other and further relief as appears reasonable and just under the circumstances.

## COUNT II

### Conspiracy to Interfere with Civil Rights
### Violations of the 14th Amendment Under 42 U.S.C. § 1985
### By the Officer Defendants

136.   Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

137.   42 U.S.C. § 1985 provides, in pertinent part:

> If two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property…, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(2), (3).

138.   The knowing use of materially false testimony, or the knowing failure to correct materially false testimony, violates the Due Process clause of the Fourteenth Amendment.

139.   Officer Defendants conspired to deprive Mr. Johnson of his right to Due Process, committed overt acts in furtherance of the conspiracy, and injured Mr. Johnson as a result.

140.    Officer Defendants each committed overt acts in furtherance of the conspiracy, including, but not limited to, the following:

a.  Defendants arrested, charged, and prosecuted Mr. Johnson for the March 30, 2007 armed robbery of Mr. Bubbles Car Wash and assault of Mark Elker and disregarded evidence demonstrating Mr. Johnson was innocent.  From before Mr. Johnson was ever arrested, Defendants knew or should have known Ronald was motivated by self-interest to curry favor with the WCSD regarding his own felony charges.

b.  Defendants had possession of Ronald's criminal complaint, police report, plea deal, and conviction. Defendants suppressed this evidence from Mr. Johnson's defense attorneys at trial.

c.  Defendants failed to engage any identification expert or analysis, excepting whole-cloth the inconsistent account of Ronald.

d.  Defendants sought a conviction of Mr. Johnson for their own personal or professional benefit.

141.    Officer Defendants had a plan to withhold evidence; the Officer Defendants shared a conspiratorial objective to deprive Mr. Johnson of his constitutional rights; and overt acts were committed in furtherance of the conspiracy that caused Mr. Johnson's injuries.

142.    Officer Defendants planned to withhold information from Mr. Johnson's defense attorney for the purpose of obstructing justice and wrongfully convicting Mr. Johnson.

143.    Revealing the truth to the factfinder would have resulted in Mr. Johnson's acquittal.

144.   Defendants conspired to obstruct the due course of justice in violation of 42 U.S.C. § 1985(2), deny Mr. Johnson equal protection of the laws in violation of § 1985(3), and deprive Mr. Johnson under color of state law of rights, privileges, and immunities secured by the Constitution and laws in violation of § 1983.

**WHEREFORE**, Plaintiff requests this Honorable Court award judgment against Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1985 and/or the laws of the State of Michigan, in addition to punitive damages, reasonable attorney fees under 42 U.S.C § 1988, costs, and interest, and such other and further relief as appears reasonable and just under the circumstances.

### COUNT III

**Civil Conspiracy Under 42 U.S.C. § 1983**
**By the Officer Defendants**

145.   Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

146.   A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). The elements of a § 1983 civil conspiracy are: "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs

of their constitutional rights, and (3) an overt act was committed" in furtherance of the conspiracy. *Id*.

147.   Officer Defendants had a single plan to arrest, detain, and prosecute Mr. Johnson without probable cause and to suppress evidence.

148.   Officer Defendants shared a conspiratorial objective to deprive Mr. Johnson of his constitutional rights under the Fourth and Fourteenth Amendments.

149.   Officer Defendants each committed overt acts in furtherance of the conspiracy, including, but not limited to, the following:

a. Defendants arrested, charged, and prosecuted Mr. Johnson for the March 30, 2007 armed robbery of Mr. Bubbles Car Wash and assault of Mark Elker and disregarded evidence demonstrating Mr. Johnson was innocent.  From before Mr. Johnson was ever arrested, Defendants knew or should have known Ronald was motivated by self-interest to curry favor with the WCSD regarding his own felony charges.

b. Defendants had possession of Ronald's criminal complaint, police report, plea deal, and conviction. Defendants suppressed this evidence from Mr. Johnson's defense attorneys at trial.

c. Defendants failed to engage any identification expert or analysis, excepting whole-cloth the inconsistent account of Ronald.

d. Defendants sought a conviction of Mr. Johnson for their own personal or professional benefit.

150.   The conspiracy to deprive Mr. Johnson of his constitutional rights resulted in substantial damages and injury to Mr. Johnson, who was wrongfully convicted and imprisoned for over 17 years.

**WHEREFORE**, Plaintiff requests this Honorable Court award judgment against Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan, in addition to punitive damages, reasonable attorney fees under 42 U.S.C § 1988, costs, and interest, and such other and further relief as appears reasonable and just under the circumstances.

## COUNT IV

**Wrongful Institution of Legal Process – Malicious Prosecution**
**Violations of the 4th Amendment Under 42 U.S.C. § 1983**
**By the Officer Defendants**

151.    Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

152.    Mr. Johnson had a constitutional right, guaranteed by the Fourth Amendment, to be free of illegal seizure and detention without probable cause, based on false statements and/or material omissions that were knowingly or recklessly made to manufacture probable cause. *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020).

153.    Defendants, as officers in charge of the investigation, were under constitutional duties to make truthful statements to the prosecutor and district court judge to establish probable cause for an arrest warrant.

154.   These Defendants influenced, conspired, or participated in the initiation of Mr. Johnson's criminal prosecution.

155.   Defendants' false statements and material omissions included all the evidence related to Ronald's criminal charges and plea deal.

156.   Through the false statements and material omissions identified above, Defendants caused Mr. Johnson to be falsely arrested, maliciously prosecuted, convicted and incarcerated, in violation of his constitutional rights.

157.   At all relevant times, Mr. Johnson's right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing fabrication of evidence and false statements and material omissions to prosecutors and magistrate judges was clearly established before Mr. Johnson was arrested.

**WHEREFORE**, Plaintiff requests this Honorable Court award judgment against Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan, in addition to punitive damages, reasonable attorney fees under 42 U.S.C § 1988, costs, and interest, and such other and further relief as appears reasonable and just under the circumstances.

## COUNT V

**Continued Detention without Probable Cause
Violations of the 4th Amendment Under 42 U.S.C. § 1983
By the Officer Defendants**

158.   Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

159.   Mr. Johnson had a constitutional right, guaranteed by the Fourth Amendment, to be free of continued detention without probable cause.  *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006).

160.   As investigative officials, Defendants had duties to refrain from engaging in acts that continued Mr. Johnson's detention without probable cause.

161.   At all times relevant, Defendants conspired and perpetuated Mr. Johnson's continued detention when it was in their power to dissolve probable cause.

162.   Defendants knew that the evidence used to detain Mr. Johnson was inconsistent, contradictory, and incomplete as it did not reference material, exculpatory evidence.

163.   Had these Defendants not ignored or suppressed material evidence listed above or by concealing and developing testimonies of witnesses, there would have been no probable cause for Mr. Johnson's continued detention.

164.   Had Defendants not unlawfully suppressed the exculpatory evidence related to Ronald's criminal charges and plea deal, probable cause for Mr. Johnson's continued detention would have been eliminated.

165.   Defendants also knew of and failed to disclose facts from which the factfinder could have inferred that Mr. Johnson was innocent.  Had this information been made known, probable cause for Mr. Johnson's continued detention would have dissolved.

166.   At all relevant times, these Defendants influenced or participated in Mr. Johnson's detention by deliberately and knowingly supplying false information and/or omitting material information which showed a reckless disregard for the truth.

167.   Through the false statements and material omissions identified above, Defendants caused Mr. Johnson to be continuously detained, day after day and year after year, from the date he was first arrested until he was finally freed.

168.   At all relevant times, Mr. Johnson's right to be free of continued detention without probable cause was clearly established long before August 1987.

**WHEREFORE**, Plaintiff requests this Honorable Court award judgment against Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan, in addition to punitive damages, reasonable attorney fees under 42 U.S.C § 1988,

costs, and interest, and such other and further relief as appears reasonable and just under the circumstances.

## COUNT VI

**Affirmative Policies, Customs, and Practices – *Monell* Violation
Violations of the 4th and 14th Amendments Under 42 U.S.C. § 1983
By Defendant Washtenaw County**

169.   Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

170.   As pled throughout this Complaint, Defendant Washtenaw County, by and through its officers, deputies, investigators, and/or agents, implemented a practice of suppressing material, exculpatory evidence from the defense or factfinder, violating the United States Constitution as interpreted by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959).

171.   Defendant Washtenaw County's decades-long pattern and practice of suppressing material, exculpatory evidence from the defense or jury amounts to an unconstitutional de facto policy.

172.   By and through their policymakers and agents, Defendant Washtenaw County maintained policies that violated clearly established law under *Brady* or *Napue*.

173.   Mr. Johnson's wrongful conviction and imprisonment were caused by Defendant Washtenaw County's affirmative customs or policies of suppressing

material, exculpatory evidence from the defense or factfinder and withhold evidence that would have cleared Mr. Johnson.

174.   As a direct and proximate result of Defendant Washtenaw County's policies and practices and willful violations of Mr. Johnson's constitutionally protected rights, Mr. Johnson was detained without probable cause, charged with crimes he did not commit, deprived of his liberty, and wrongfully convicted and imprisoned for over 17 years, causing him to suffer the injuries and damages set forth above.

**WHEREFORE**, Plaintiff requests this Honorable Court award judgment against Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan, in addition to punitive damages, reasonable attorney fees under 42 U.S.C § 1988, costs, and interest, and such other and further relief as appears reasonable and just under the circumstances.

<u>**COUNT VII**</u>

**Failure to Train – *Monell* Violation**
**Violations of the 4th and 14th Amendments Under 42 U.S.C. § 1983**
**By Defendant Washtenaw County**

175.   Plaintiff incorporates by reference the foregoing paragraphs, as though fully set forth herein.

176.   Defendant Washtenaw County can be liable under § 1983 for constitutional violations arising from its failure to train its employees properly. *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).

177.   At all times relevant, Defendant Washtenaw County was on actual or constructive notice that its employees suppressed and/or withheld material, exculpatory evidence.

178.   Defendant Washtenaw County foresaw, or should have foreseen, or was placed on actual or constructive notice, that people were being arrested for and convicted of crimes they did not commit.

179.   At all relevant times, Defendant Washtenaw County failed to train investigators, including their Defendant officers, of their constitutional obligations to disclose and produce exculpatory and impeachment evidence to criminal defendants.

180.   For years, Defendant Washtenaw County tolerated constitutional violations under *Brady* and *Napue* which enabled its employees to arrest and convict Mr. Johnson and others in violation of their constitutional rights.

181.   The failures of Defendant Washtenaw County to provide adequate training and supervision to investigators is shown through a pattern of similar constitutional violations by its officers, its adherence to an approach that it knew failed to prevent tortious conduct by officers, or in the alternative, failed to train its

employees to handle recurring situations presenting an obvious potential for a constitutional violation.

182.   The failures of Defendant Washtenaw County to implement different or additional trainings for its officers was so apparent that its failures to do so are properly characterized as deliberate indifference to Mr. Johnson's constitutional rights.

183.   The failures of Defendant Washtenaw County to adequately train its officers was the moving force of Mr. Johnson's arrest and wrongful conviction.

184.   As a direct and proximate result of Defendant Washtenaw County's failures to train and deliberate indifference, Mr. Johnson was charged with crimes he did not commit, deprived of his liberty, and wrongfully convicted and imprisoned for over 17 years, causing him to suffer the injuries and damages set forth above.

**WHEREFORE**, Plaintiff requests this Honorable Court award judgment against Defendants for compensatory damages, which include, but are not limited to, non-economic and economic damages, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan, in addition to punitive damages, reasonable attorney fees under 42 U.S.C § 1988, costs, and interest, and such other and further relief as appears reasonable and just under the circumstances.

Respectfully submitted,

*/s/ Shereef H. Akeel*
**AKEEL & VALENTINE, PLC**
SHEREEF H. AKEEL (P54345)
HASAN KAAKARLI (P81099)
SAMUEL R. SIMKINS (P81210)
Attorneys for Plaintiff
888 W. Big Beaver Road., Suite 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
hayden@akeelvalentine.com

DATED: October 11, 2024

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNELL JOHNSON,

          Plaintiff,

v.

                                   Case No.: 24-12701

WASHTENAW COUNTY, MARK
NEUMANN, and SCOTT HEDDLE,

          Defendants.

Judge:

_____

AKEEL & VALENTINE, PLC
SHEREEF H. AKEEL (P54345)
HASAN KAAKARLI (P81099)
SAMUEL R. SIMKINS (P81210)
Attorneys for Plaintiff
888 W. Big Beaver Road., Suite 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
hayden@akeelvalentine.com

_____

## **JURY DEMAND**

_____

NOW COME Plaintiff, RONNELL JOHNSON, by and through his undersigned counsel, Akeel & Valentine, PLC, and hereby demands a Trial by Jury of the above-referenced causes of action.

Respectfully submitted,

*/s/ Shereef H. Akeel*
**AKEEL & VALENTINE, PLC**
SHEREEF H. AKEEL (P54345)
HASAN KAAKARLI (P81099)
SAMUEL R. SIMKINS (P81210)
Attorneys for Plaintiff
888 W. Big Beaver Road., Suite 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com
hayden@akeelvalentine.com

DATED: October 11, 2024