UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **RONNELL JOHNSON**, | **2:24-CV-12701-TGB-APP** |
| Plaintiff, | HON. TERRENCE G. BERG |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT OFFICERS' MOTION TO DISMISS (ECF NO. 15)** |
| **WASHTENAW COUNTY, MARK NEUMANN, and SCOTT HEDDLE,** | |
| Defendants. | **AND GRANTING DEFENDANT WASHTENAW COUNTY'S MOTION TO DISMISS (ECF NO. 16)** |

Ronnell Johnson has brought a wrongful incarceration lawsuit under § 1983 against Washtenaw County and former County Officers Mark Neumann and Scott Heddle. ECF No. 1. The Defendant Officers, Neumann and Heddle, filed a motion to dismiss, ECF No. 15, followed by Defendant Washtenaw County, ECF No. 16. The motions are fully briefed. *See* ECF Nos. 18, 19, 20, & 21. The Court heard oral arguments on August 11, 2025. ECF No. 23.

For the following reasons, the Defendant Officers' Motion to Dismiss (ECF No. 15) will be **GRANTED IN PART** and **DENIED IN PART**. Defendant Washtenaw County's Motion to Dismiss (ECF No. 16) will be **GRANTED**.

## I. BACKGROUND

### A. Armed Robbery and Arrest

On March 30, 2007, an armed robbery occurred at a Mr. Bubbles Car Wash in Ypsilanti Township. *Complaint*, ECF No. 1, PageID.9, ¶ 34. Security camera footage showed two perpetrators entering the premises and robbing the car wash and its owner, Mark Elker, at gunpoint, and repeatedly hitting him with the gun. *Id.* at ¶¶ 35, 40, 70. Defendant Officer Scott Heddle was on duty at the time of the robbery and responded to the 911 call. *Id.* at ¶ 38. Both suspects on the security camera had masks covering most of their faces and Mr. Elker was unable to identify any perpetrators. *Id.* at ¶ 40.

At the time, there was an increase in unsolved armed robberies in the area, creating significant public pressure on the Washtenaw County Sheriff's Department ("WCSD") to crack down on crime. *Id.* at ¶ 37. On April 6, 2007, after a week without any leads, and in response to this pressure, WCSD released the security footage to local media and asked the public for help identifying the perpetrators. *Id.* at ¶ 42.

The next day, on April 7, 2007, Plaintiff's father, Ronald Johnson ("Ronald"), saw the footage on the news and contacted WCSD to identify one of the perpetrators as his son, Plaintiff Ronnell Johnson. *Id.* at ¶ 43. That same day, Defendant Officer Heddle met with Plaintiff's father, Ronald, to discuss his identification of his son. *Id.* at ¶ 8. Based entirely on Ronald's identification, Defendant Officer Heddle sought and received

a warrant to search Plaintiff's home that day. *Id.* at ¶ 9. Plaintiff was arrested and taken into custody by WCSD the same day and interrogated as a suspect by Defendant Officer Mark Neumann. *Id.* at ¶¶ 10, 44. Plaintiff unwaveringly maintained that he was innocent. *Id.* at ¶ 45.

### B. Investigation

Although the robbery suspect was wearing a mask that covered his face from the nose down, and Ronald was estranged from his son, Ronald insisted that the unidentified man was his son Ronnell. *Id.* at ¶¶ 43-45. After Ronald implicated Ronnell, the Officer Defendants stopped pursuing other leads, and never identified the other perpetrators, despite the robbery being carried out by four individuals. *Id.* at ¶¶ 80-81.

While Plaintiff's aunt, Cynthia Fort, also identified Ronnell as the suspect, her testimony was inconsistent, and she recanted it years later. *Prosecutor's Response to Motion for Relief from Judgment* ("Prosecutor's Resp."), ECF No. 1-6, PageID.61; *Complaint*, ECF No. 1, ¶ 57. On the contrary, several family members who lived with Ronnell testified that he was not the suspect. *Complaint*, ECF No. 1, ¶¶ 28-29.

Defendant Officers did not engage in any identification expert analysis or any voice identification analysis for the victim, *id.* at ¶ 91, even though Ronnell is 6'1" tall without shoes, while the suspect was only 5'9" with shoes on, *id.* at ¶¶ 76, 78, and Ronnell's hairline was different from the suspect's, *id.* at ¶ 90.

Furthermore, no physical evidence was ever uncovered or presented to connect Ronnell to the crime, despite the officers' search of his house. *Id.* at ¶ 45. In fact, the coat the Officers recovered from Ronnell's house did not match the coat worn by the suspect in the security footage. *Id.* at ¶ 61. Moreover, Ronnell's coat and gun found at his house were sent to a lab for testing and revealed no connection to the crime. *Id.* at ¶ 70.

In addition, there were some contradictions between the security footage and Ronald's account. For instance, Ronald told the Officers that Ronnell had stolen Ronald's fingerless driving gloves from him, and that he recognized the gloves worn by the suspect as the same ones, but the footage showed the gloves worn by the suspect were not fingerless and were Franklin branded baseball batting globes. *Id.* at ¶¶ 63-65.

### C. *Brady* Violation

Plaintiff's father, Ronald, continued to be a key witness in the case, as he testified at Plaintiff's preliminary hearing in October 2007 and again at his trial in March 2008. A month before the trial, on February 6, 2008, Defendant filed a motion for discovery for Ronald Johnson's criminal history, stating that the information was necessary to adequately prepare for cross-examination and for impeachment purposes. *Prosecutor's Resp.*, ECF No. 1-6, PageID.68. At a hearing on February 13, 2008, the trial court denied the motion for discovery, finding that the disclosure of Law Enforcement Information Network ("LEIN") information to a private person violates the LEIN Act, but noted that "the

prosecutor has an obligation to turn over information regarding a witness' criminal background that would be beneficial to the defendant and that the prosecutor otherwise has in his file." *Id.*

Unfortunately, the criminal history of Ronald Johnson was never provided. Had it been provided, it would have revealed that Ronald Johnson was facing criminal charges of his own when he identified Ronnell and that, unbeknownst to the defense, he received a favorable plea deal just a month after identifying Ronnell.

On January 12, 2007, two months *before* the car wash robbery, Ronald Johnson was charged by the Washtenaw Prosecuting Attorney with two counts of felonious assault with a dangerous weapon. The charges alleged that Ronald Johnson threatened to shoot two people, including a WCSD officer, Samuel Wallace, on November 20, 2006. *Felony Complaint*, ECF No. 1-1, PageID.47; *Incident Report*, ECF No. 1-6, PageID.84; *People v. Ronald Porter Johnson*, No. 07-000066-FH, Washtenaw County Circuit Court. Deputy Stuck, Deputy Carey, Deputy Buffa, Deputy Reynolds, Deputy Lower, and Deputy Wagner were dispatched to respond to that incident. *Incident Report*, ECF No. 1-6, PageID.84-85. At that time, Ronald was facing up to six years in prison as a habitual offender. *Complaint*, ECF No. 1, ¶ 15; *Habitual Offender Notice*, ECF No. 1-2, PageID.49.

But on May 8, 2007, one month *after* Ronald contacted WCSD to identify Plaintiff as a suspect, Ronald entered a plea to misdemeanor

assault and battery, and the Washtenaw County Prosecutor's Office dismissed the felonious assault charges and the habitual offender notice. *Complaint*, ECF No. 1, ¶¶ 49-51; *Amended Information*, ECF No. 1-3, PageID.51; *Dismissal Order*, ECF No. 1-4, PageID.53. As a consequence of this plea, Ronald was allowed to avoid prison entirely. He was sentenced on June 7, 2007 to an 18-month term of probation. *Complaint*, ECF No. 1, ¶¶ 49-51. There is no record of Ronald Johnson's criminal file that might provide additional information regarding the nature and scope of his plea deal, because the Washtenaw County Prosecutor's Office purged Ronald's file. *Prosecutor's Resp.*, ECF No. 1-6, PageID.70. But at his plea hearing, both Ronald and the Washtenaw County Prosecutor's Office stated on the record that no promises or threats were made. *Id*. Consequently, there is no direct evidence proving that Ronald Johnson received a reduced charge and probationary sentence as a quid pro quo for cooperating and testifying against Plaintiff. But the chain of circumstantial evidence suggests as much.

A few months later, in October 2007, Ronald testified at Plaintiff's preliminary examination. *Complaint*, ECF No. 1, ¶ 11. Based only on Ronald's testimony, the judge found probable cause and bound Plaintiff's case over to the Circuit Court on felony charges for armed robbery. *Id*.; *Michigan v. Ronnell Johnson*, No. 07-001499-FC, Washtenaw County Circuit Court.

6

At Plaintiff's trial in March 2008, Ronald testified again. *Complaint*, ECF No. 1, ¶ 18. Ronald identified Plaintiff as one of the perpetrators in the security video. *Id*. at ¶ 55. Ronald's credibility was a central issue at trial. *Id*. at ¶ 56. In closing, the prosecution reiterated Ronald's certainty and assured the judge that Ronald "was not a person who came to court with any agenda." *Id*. The judge started his verdict by stating:

> The trial has taken on kind of an interesting, almost surreal character … involving the parents of the defendant. In perhaps … one answer to Mr. Arimah's question as to why would the defendant's father present this information to the police. Well, there certainly is a disparity in the testimony. … There's any number of reasons why an individual may give up their child. … [P]erhaps because they see them going down the wrong path and they have no way of doing it.

*Id*. at ¶ 66. Following the bench trial, Plaintiff was convicted and sentenced on April 23, 2008. *Two months later*, on June 30, 2008, his father Ronald was discharged early from probation after only 13 months. *Prosecotur's Resp*., ECF No. 1-6, PageID.70; Register of Actions, *People v. Ronald Johnson*, No. 07-000066-FH, Washtenaw County Circuit Court.

Plaintiff, however, was imprisoned for more than 14 years until his conviction was reversed. He was released after the Washtenaw County Prosecutor's Office conceded that his conviction was the result of a *Brady* violation for failure to disclose the existence of his father's plea deal. *Complaint*, ECF No. 1, ¶¶ 21-22; *Prosecutor's Resp*., ECF No. 1-6,

PageID.71. The Washtenaw County Prosecutor's Office stated that "[t]he case rested, therefore, almost exclusively on testimony by [Plaintiff's] father, Ronald, and his aunt identifying him as the perpetrator" as "[t]here was no direct physical evidence linking Ronnell Johnson to the crime, and most of the circumstantial physical evidence—specifically the jacket and the firearm—were highly contested and did not weigh heavily in the Court's ruling." *Prosecutor's Resp.*, ECF No. 1-6, PageID.78; *Complaint*, ECF No. 1, ¶ 99.

On June 10, 2022, Plaintiff filed a (successful) claim in the Michigan Court of Claims under the Wrongful Incarceration Claims Act ("WICA") against the State of Michigan. *Register of Actions*, ECF No. 16-2, PageID.247-48. Plaintiff subsequently filed the present lawsuit asserting federal constitutional claims under 42 U.S.C. §§ 1983 and 1985 against Washtenaw County, Officer Heddle, and Officer Neumann.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has satisfied that requirement. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating

whether a plaintiff has set forth a plausible claim, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 456 (6th Cir. 2011) (quotation omitted). "[M]ere conclusions," however, "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 668.

## III. DISCUSSION

### A. Defendant Officers' Motion to Dismiss (ECF No. 15)

#### 1. Count I: Brady Violation

In the landmark case of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A *Brady* claim has three elements: (1) the evidence must be favorable to the plaintiff (exculpatory or impeaching); (2) the evidence must have been suppressed by the State; and (3) the plaintiff must have experienced prejudice. *Jackson v. City of*

*Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (citing *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).[1]

### (a) Ronald's Charges and Plea Deal

Plaintiff based his *Brady* claim on his assertion that Defendant Officers Neumann and Heddle withheld the fact that Ronald Johnson, a key witness at Plaintiff's criminal trial, received a plea deal prior to testifying:

> ¶ 124. Defendants conspired to and/or withheld exculpatory or impeachment evidence, including, but not limited to, the fact that the prosecution[']s main witness, Ronald Johnson, was charged with felonious assault merely three months before implicating Mr. Johnson and that Ronald received an extremely favorable plea deal only one month after implicating Mr. Johnson.

*Complaint*, ECF No. 1, PageID.29. The Washtenaw County Prosecutor's Office—not a named defendant in this case—admitted to committing a *Brady* violation in Ronnell's criminal case. But Officers Neumann and Heddle argue *they* did not violate *Brady*.

---

[1] Plaintiff alleged that the evidence "was obviously favorable to [him] because the evidence would have demonstrated that [his father] was motivated by self-interest to curry favor with the very same department that was bringing charges against him." *Complaint*, ECF No. 1, ¶ 128. For the purposes of this motion only, Defendant Officers assume the evidence would have been favorable to Plaintiff and that Plaintiff experienced prejudice. ECF No. 15, PageID.207-08.

Though police officers need not disclose information "directly to the defense," *Brady* "obliges a police officer to disclose material exculpatory evidence . . . to the prosecutor." *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014). Thus, officers can violate *Brady* if they fail to "inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime." *Moldowan v. City of Warren,* 578 F.3d 351, 378 (6th Cir. 2009). However, the Sixth Circuit explained that "where exculpatory evidence is already known to the prosecutor, a law enforcement officer bears no further disclosure duty with respect to that evidence." *Alexander v. Harrison*, No. 21-1828, 2022 WL 13983651, at *4–5 (6th Cir. Oct. 24, 2022). That is so, even when the officer discloses the evidence "mid-trial," because the "prosecuting attorney bears the ultimate responsibility for disclosing exculpatory evidence . . . when that evidence is known to the prosecutor." *Johnson v. Scheidler*, No. 05-CV-74465, 2007 WL 1119876, at *9 (E.D. Mich. Apr. 16, 2007)(Borman, J.); *see also Wiser v. Boyle Cnty. Sheriff's Dep't*, No. CV 5:25-012-DCR, 2025 WL 1805252, at *3 (E.D. Ky. June 30, 2025) (citing *Alexander*, 2022 WL 13983651, at *4) ("Given that the exculpatory evidence was known to the prosecutor by that point, [the officer] bore 'no further disclosure duty with respect to that evidence.'").

The salient legal issue at this juncture is whether the Complaint sufficiently states a *Brady*-derived claim against the officers when it is alleged the prosecutor assigned to Plaintiff's case did not know about the exculpatory information, but the information was in the possession of the

prosecutor's office. Of course, there is no question that the Washtenaw County Prosecutor's Office, who made the plea deal with Plaintiff's father, had information about the father's charges and plea deal in its possession. *Prosecutor's Resp.*, ECF No. 1-6, PageID.75 (admitting that "Ronald's criminal history was in the possession of the Prosecutor's Office").[2] But while the Washtenaw County Prosecutor's Office was responsible for both Ronnell's and Ronald's prosecution, the cases were handled separately, and the prosecutor's office maintains there is no evidence that "the trial APA in [Plaintiff's] case was aware of Ronald's plea and sentence." *Id.*

Even though courts discussing police officers' *Brady*-derived duties interchangeably refer to the "prosecution," "the prosecutor," "the prosecuting attorney," the "prosecutors," or "the prosecutor's office," a careful reading of the case law clarifies that the officers have a duty to disclose exculpatory evidence that is unknown *to the prosecuting attorney* on the case. For instance, in *D'Ambrosio*, the Sixth Circuit stated, within the same paragraph, that the complaint failed to allege that the detective violated his *Brady*-derived duty to disclose evidence "to the *prosecutor's office*" where there was no allegation that the detective "knew about any

---

[2] At the motion to dismiss stage, a district court may consider "exhibits attached to the complaint, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011).

obviously exculpatory evidence of which *the prosecutors* were ignorant." 747 F.3d at 390 (6th Cir. 2014) (emphasis added). Similarly, in *Alexander*, while the Sixth Circuit held that officers had a duty to disclose "evidence unknown to the *prosecution*," the same paragraph clarifies that officers need not disclose evidence "already known to the *prosecutor*." 2022 WL 13983651, at *4 (emphasis added); *see also Scheidler,* 2007 WL 1119876, at *9 (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)) ("Police officers can be liable for *Brady* violations when the exculpatory evidence is 'known only to police investigators and not to the prosecutor.'").[3]

The Supreme Court has made it clear that prosecutor's offices are obliged to "insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States*, 405 U.S. 150, 154 (1972). But the tangible risk of "communications breakdown within the [Prosecutor's] Office"—as the prosecutor's office in this case alleges happened, ECF No. 1-6, PageID.79—is all the more reason why it is

---

[3] The decisions of other circuit courts of appeal support this conclusion. *See, e.g.*, *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) ("One standard police function is to provide information to the prosecutor and the courts. Thus, a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information."); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) ("[A]ttempts to circumvent the rule of [*Brady*] by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."); *Hart v. O'Brien*, 127 F.3d 424, 446-47 (5th Cir. 1997) ("[A] plaintiff states a section 1983 claim against a police officer who, after learning of 'patently exculpatory evidence,' deliberately fails to disclose it to the prosecutor.") (citation omitted).

important for police officers to disclose exculpatory information even when it may readily be available to the prosecutor on the case from other sources. After all, officers would be expected to disclose to the prosecutor approving a search warrant application if a key source providing probable cause is reliable, including whether he has a record or pending criminal charges, even though that information would be in the possession of the prosecutor's office and thereby readily available to the prosecutor. Indeed, as the Sixth Circuit explained,

> Because the prosecutor's office generally lacks its own investigative machinery, prosecutors often are entirely dependent on the police to turn over the fruits of their investigation. . . . [T]he obligations imposed under *Brady* would be largely ineffective if those other members of the prosecution team had no responsibility to inform the prosecutor about evidence that undermined the state's preferred theory of the crime.

*Moldowan*, 578 F.3d at 378–80. The role of the police is to "accumulate evidence and then ministerially deliver it to the prosecutor" who "then makes a discretionary legal judgment about whether the evidence is material and exculpatory." *Id.* (citations omitted).

Thus, effective communication within a prosecution team as a whole—which "at its core includes prosecutors and police officers who perform investigative duties," *Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804, at *5 (6th Cir. 2023)—is part of what is expected. The more effectively information is disseminated within the prosecution

14

team, the more likely it is that the duty to disclose *Brady* information to the defense will be fully met. If an officer is aware of *Brady* information, she should make certain the prosecutor is advised of it in order to ensure that it will be disclosed to the defense. A rule that counsels silence in the hope that such information could be available elsewhere is a rule that encourages non-disclosure.

In summary, if the evidence might be exculpatory, the officers should not risk failing to disclose it to the prosecuting attorney, even if it may be in the possession of the prosecutor's office, because the prosecuting attorney on the case may not be aware of such information. The default rule should be for the officer to disclose exculpatory evidence to the prosecutor who is handling the case.

As a result, in this case, the police officers had a duty to disclose exculpatory information that was unknown to the prosecutor involved in the case, even though the evidence was in the possession of the prosecutor's office.[4] To plead a *Brady*-derived claim against the officers, the complaint must plausibly allege that (1) the officers had knowledge of exculpatory information (2) which the prosecutor did not know about. *See Alexander*, 2022 WL 13983651, at *4–5 (holding that the *Brady* claim

---

[4] Defendants have not yet asserted qualified immunity as a defense. As a result, whether the officers' duty to disclose the information under the facts here was clearly established is not in issue at this stage. Nothing in this opinion is intended to pre-judge the question of qualified immunity should Defendants wish to assert such a defense at a later stage.

failed as a matter of law where the plaintiff "fail[ed] to identify any evidence known to [the officer] but unknown to the prosecution").

*First*, the officers' knowledge. The Complaint alleges the officers "knew of the information regarding Ronald's criminal charges and plea deal" and "had possession of Ronald's criminal complaint, police report, plea deal, and conviction." ECF No. 1, ¶¶ 119, 149b. During oral argument, Plaintiff conceded that he did not know for certain at this stage whether, when, or how, the officers knew about the information, partly because WCSD purged Ronald's file so that Plaintiff is not able at this time to identify whether there was any overlap between Ronald and Ronnell's case staffing.

However, Plaintiff alleges that the officers' knowledge could be reasonably inferred because Ronald was charged for assaulting one of their own WCSD colleagues in their jurisdiction. ECF No. 1, ¶ 14. Furthermore, given how central Ronald's testimony was to the case, it is reasonable to infer the officers paid close attention to his criminal history, which would have revealed the pending charges and/or the plea deal before the end of Plaintiff's trial. This is particularly true given the trial court's order for the prosecutor to "turn over information regarding a witness' criminal background that would be beneficial to the defendant and that the prosecutor otherwise has in his file." *Prosecutor's Resp.*, ECF No. 1-6, PageID.68.

*Second*, the prosecutor's lack of knowledge. Alleging that the officers "withheld" information, ¶ 124, is not quite the same as alleging the prosecutor was unaware of the evidence. The distinction is significant, because if the prosecutor is aware of the *Brady* information, the duty to disclose devolves onto the prosecutor, and the officers' knowledge or withholding of that information becomes immaterial. Here, Plaintiff's complaint does attach an exhibit in which the Washtenaw County Prosecutor's Office states that "there is no indication that the trial APA in [Plaintiff's] case was aware of Ronald's plea and sentence." *Id.* at PageID.75. This is somewhat of a self-serving statement for the prosecutor's office, in the sense that knowledge by the prosecutor would reveal a knowing *Brady* violation. Moreover, it strains credulity to accept that the prosecutor in charge of the case would not have been aware of the star witness' criminal background, especially because the defense requested Ronald's criminal history, which created an additional reason to look for, and disclose, evidence of the plea deal. Nevertheless, at the pleading stage, the Court must take the allegations as true. Here, the complaint adopts the prosecutor's office's statement that the APA was not aware of the information. Accepting this as true, then the need for disclosure by the officers becomes paramount.

At the same time, however, this situation raises the question of whether the officers were aware that the prosecutor did not know about the exculpatory evidence. It does not appear that a plaintiff must allege

the officers knew the prosecutor did not know about exculpatory evidence in their possession to state a *Brady*-derived claim. In fact, the Sixth Circuit does not require a § 1983 plaintiff asserting a *Brady*-derived claim against the police to show the police's "conscious or calculated effort to suppress" evidence, as the officer's failure to disclose evidence whose exculpatory value is apparent "constitutes a due process violation, regardless of [sic] whether a . . . plaintiff can show that the evidence was destroyed or concealed in 'bad faith.'" *Moldowan*, 578 F.3d at 388. The court explained:

> The reason no *further* showing of animus or bad faith is required is that, where the police have in their possession evidence that they know or should know 'might be expected to play a significant role in the suspect's defense,' the destruction or concealment of that evidence can *never* be done 'in good faith and in accord with their normal practice.' Consequently, requiring a criminal defendant or § 1983 plaintiff to show a 'conscious' or 'calculated' effort to suppress such evidence would be superfluous.

*Id.* at 388–89 (internal citations omitted). However, whether it was reasonable for the officers to believe the prosecutor already knew about the plea deal because the prosecutor's office had the information in its possession may bear on the question of qualified immunity, which is not currently before the Court.

Therefore, at the pleading stage, the Complaint sufficiently alleges a *Brady*-derived claim against the officers for their alleged failure to

disclose information about Ronald's charges and plea deal to the prosecution.

### (b) Other Evidence

Plaintiff also argues in his Response that the police officers violated their *Brady* obligation by withholding from the prosecutor numerous other facts that would have "undermine[d] the state's preferred theory of the crime," *D'Ambrosio*, 747 F.3d at 389, including:

- Ronald's account of the suspect as Ronnell was premised on two obvious and objective inaccuracies (the gloves and bandana), *see* ECF No. 1, ¶¶ 63, 65, 69;
- The lab test results of the gun and coat from Ronnell's house offered no connection to the crime, *see id*. at ¶ 70;
- The suspect was significantly shorter than Ronnell, *see id*. at ¶¶ 75-79;
- Ronnell's hairline did not match the suspect's, *see id*. at ¶ 90;
- Ronald was estranged from his son and had a history of abuse, and had not lived with Ronnell since he was a young child, *see id*. at ¶¶ 28-29, 58.

ECF No. 18, PageID.271. Defendants, however, point out that Plaintiff appears to be re-writing his *Brady* claim because none of these alleged facts were presented in the Complaint as *Brady* violations. *See* ECF No. 1, ¶¶ 28-29. However, the *Brady* claim is broadly worded: it says it is "not limited to" evidence of the plea deal, *id*. at ¶ 124, and it "incorporates by reference" paragraphs 1 through 120, which includes the above-mentioned allegations.

But even considering those allegations, they are insufficient to state a claim against the officers based on *Brady*. Plaintiff certainly knew about his own estrangement from Ronald as well as the "obvious and objective" discrepancies between the video footage and Ronald's testimony, including his own height, hairline, coat, and gloves, which were allegedly challenged at trial. *See, e.g.*, *Complaint*, ECF No. 1, ¶¶ 61, 63, 78. Thus, there was no *Brady* obligation to point out such information. *See Spirko*, 368 F. 3d at 610 (no *Brady* violation where "the defendant was aware of the essential facts that would enable him to take advantage of the exculpatory evidence"); *Johnson v. Scheidler*, 2007 WL 1119876, at *10 ("[O]nce . . . the prosecuting attorney . . . discovered the existence of the . . . evidence, mid-trial, assuming there was a disclosure obligation, it was his responsibility, and not Defendant [officer]'s, to disclose the evidence to Plaintiff."). Furthermore, while Plaintiff states in his Response that the officers did not disclose that "[t]he lab test results of the gun and coat from Ronnell's house offered no connection to the crime," ECF No. 18, PageID.271, the Complaint only alleges it "should have been surprising" to the officers that the lab test came back inconclusive, ECF No. 1, at ¶ 70, but does not allege that the officers withheld the results from the prosecutor.

Therefore, the *Brady* count against the officers survives the motion to dismiss only as to the allegation that they failed to disclose a "key fact"

implicating Ronald's credibility, that is information about his charges and plea deal. ECF No. 1, ¶¶ 28-29.

### 2. Count IV & V: Malicious Prosecution and Continued Detention Without Probable Cause

The Sixth Circuit recognizes a "'constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Meeks v. City of Detroit, Michigan*, 727 F. App'x 171, 176 (6th Cir. 2018) (citations omitted). The Sixth Circuit explained that,

> There are two types of § 1983 claims, both sounding in the Fourth Amendment, that are sometimes referred to as "malicious prosecution" claims. One is for the wrongful institution of legal process (which is the type most properly called a "malicious prosecution" claim) and the other is for continued detention without probable cause.

*Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019). Plaintiff brought those two types of claims under the Fourth Amendment: one under a label of "wrongful institution of legal process—malicious prosecution" and another under a label of "continued detention without probable cause." Defendants argue the counts as alleged are duplicative.

Plaintiff argues that while his continued detention claim arises under the Fourth Amendment, the Sixth Circuit in dicta suggested that a substantive due process claim based on malicious prosecution under the Fourteenth Amendment may exist. *Susselman v. Washtenaw Cnty. Sheriff's Off.*, 109 F.4th 864, 871 (6th Cir. 2024), *cert. denied sub nom.*

*Susselman v. Washtenaw Cnty. Sheriff's Off.*, 145 S. Ct. 190 (2025). But the Complaint states that the malicious prosecution claim arises out of the Fourth Amendment, not the Fourteenth, and in any event, a "constitutional malicious prosecution claim cannot lie under the Fourteenth Amendment in the context of an unreasonable seizure" as it must instead be brought under the Fourth Amendment—which would be redundant here. *Id.* at 870 (citing *Albright v. Oliver*, 510 U.S. 266, 274–75 (1994)); *see also Tlapanco v. Elges*, 969 F.3d 638, 654 (6th Cir. 2020) ("The gravamen of a so-called malicious prosecution offense, arising from the Fourth Amendment's prohibition against unreasonable searches and seizures, "is continued detention without probable cause.").

Furthermore, in claiming he "sufficiently plead" his continued detention count without suggesting a different prima facie standard, ECF No. 18, PageID.273, Plaintiff accepts Defendants' use of the same legal standard for both counts, which underscores their redundancy. Therefore, the allegations supporting Count IV and V will be considered together for a single malicious prosecution claim and Count V will be **DISMISSED** as redundant.

To bring a claim for malicious prosecution under the Fourth Amendment, Plaintiff must allege (1) that a criminal prosecution was initiated against him and that Defendant Officers "made, influenced, or participated" in the decision to prosecute; (2) that there was a lack of probable cause for said criminal prosecution; (3) that he suffered a

deprivation of liberty as a result of said criminal prosecution; and (4) that the criminal proceeding has been resolved in his favor. *Tlapanco*, 969 F.3d at 654-55 (citing *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010)). For the purposes of this motion only, Defendant Officers assume that Plaintiff suffered a deprivation of liberty and that the underlying criminal proceeding resolved in Plaintiff's favor. But they argue that Plaintiff has not sufficiently alleged the Defendant Officers participated in the decision to prosecute him and that probable cause was lacking.

An officer participates in and influences the decision to prosecute by "[p]roviding reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements . . . when (1) those materials formed the basis for the charge" and "(2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth." *Meeks v. City of Detroit*, 727 F. App'x 171, 178 (6th Cir. 2018). "An officer possesses probable cause when, at the moment the officer seeks the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he or she] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (citations omitted). Generally, "the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007).

The Complaint alleges that the Officer Defendants "influenced, conspired, or participated in the initiation of Mr. Johnson's criminal prosecution" when they made "material omissions" to "the prosecutor and district court judge" with regards to "all the evidence related to Ronald's criminal charges and plea deal" when they requested an arrest warrant, ECF No. 1, ¶¶ 153-55, and search warrant, *id.* at ¶ 9, solely on Ronald's identification of Ronnell. *See Tlapanco*, 969 F.3d at 655 (noting that the fact that the prosecutor's office "authorized the arrest warrant and created the charging document" did not negate the influence of the officers who "supplied the reports and investigative materials forming the basis for the specific charges"); *Wesley*, 779 F.3d at 433 ("[Officer's] application for an arrest warrant contained omissions that were deliberate or showed reckless disregard for the truth and were material to the finding of probable cause.").

Plaintiff argues the officers did not have probable cause to arrest Ronnell because they had "apparent reason[s]" to question Ronald's reliability due to his alleged estrangement from Ronnell and his pending charges. *See id.* at 430 ("[P]robable cause does *not* exist where 'there is an apparent reason for the officer to believe that the eyewitness was lying.'"). While officers are not required to "resolve all credibility issues between witnesses, before making an arrest based on probable cause," *Marriott v. Persing*, No. 23-3620, 2024 WL 1049451, at *3 (6th Cir. 2024) (citation omitted), their failure to properly investigate when they "had

reason to doubt the accuracy or veracity of the victim's allegations" may constitute sufficiently culpable conduct to infer participation, *Meeks*, 727 F. App'x at 179–80 (citing *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015)). In fact, where probable cause for an arrest is based solely on an eyewitness's statements, a claim for false arrest survives the motion to dismiss stage as long as the complaint "alleges facts allowing the fact-finder to infer some 'apparent reason to question'" the eyewitness's reliability or to "believe that the eyewitness was lying." *Wesley*, 779 F.3d at 430.

The Complaint alleges that "[f]rom before [Plaintiff] was ever arrested, Defendants knew or should have known Ronald was motivated by self-interest to curry favor with the WCSD regarding his own felony charges." ECF No. 1, ¶ 140. As discussed above, while Plaintiff does not know when the Defendant Officers learned about Ronald's pending charges, it is plausible to infer that the Officer Defendants were aware of Ronald's criminal charges because the underlying incident involved one of their WCSD colleagues and because it is common practice to inquire into a witness' criminal history during an investigation.

Furthermore, Plaintiff alleged the officers were "aware . . . that Ronald was Mr. Johnson's estranged and abusive father." *Id*. at ¶¶ 28-29. In the complaint, Plaintiff alleges that Ronald did not live with Ronnell any time after the age of five and that they saw each other only occasionally. *Id*. at ¶ 58. Because Officer Heddle spoke with Ronald and

Officer Neumann spoke with Ronnell the day of his identification and arrest, *id.* at ¶¶ 8, 10, it is plausible to infer the officers inquired about their relationship and became aware of their strained relationship at that time. But the existence of a strained relationship does not support a reasonable inference that the officers did not believe Ronald was telling the truth. Plaintiff is only able to allege that the Officers were aware that Ronald had a motive to curry favor and that he had a poor relationship with his son. There is no allegation that they were aware that Ronald was lying.

Indeed, even if the Officers had disclosed Ronald's prior criminal history, his incentive to cooperate, and his negative relationship with Plaintiff, there is no reason to believe that the reviewing magistrate would not have found his identification of Plaintiff from the video sufficient to support a finding of probable cause. The Complaint therefore fails to sufficiently plead a malicious prosecution claim as to the events surrounding the initial decision to arrest Plaintiff.

The Complaint also alleges the officers "perpetuated [Plaintiff's] continued detention," ¶ 161, when they "fail[ed] to correct" Ronald's "materially false testimony," ¶ 138, with "reckless disregard for the truth," ¶ 166, which caused a faulty judicial determination of probable cause at the preliminary examination in October 2007 where Ronald's testimony was "the only basis for probable cause." *Id.* at ¶ 11. However, while Plaintiff's malicious prosecution claim relies on the theory that the

officers' application for a search and arrest warrant lacked probable cause to arrest, the later finding of the district judge of probable cause to bind the case over for trial was based on *Ronald*'s testimony, as opposed to *the officers*' affidavit. A judicial determination of probable cause generally precludes a finding of no probable cause under § 1983, *Khalil v. Wilson*, No. 21-12577, 2025 WL 1433675, at *12 (E.D. Mich. May 14, 2025)(Kumar, J.), unless "there is evidence that the claim of malicious prosecution is based on a police officer's supplying false information to [the judicial body] to establish probable cause," *Peet v. City of Detroit*, 502 F. 3d 557, 556 (6th Cir. 2007), such as by "omit[ting] information from the affidavit" with the intent to "mislead the judge," *Bailey v. City of Ann Arbor*, 860 F.3d 382, 385 (6th Cir. 2017). Consequently, even if Ronald's testimony contained material omissions, it was not due to actions by the officers.

Accordingly, the Complaint fails to sufficiently allege all of the necessary elements to support a malicious prosecution claim and Count IV will also be **DISMISSED** with prejudice.

### 3. Counts II & III: Civil Conspiracy

To plead a claim for civil conspiracy under § 1983, a plaintiff must allege the existence of "an agreement between two or more persons to injure another by unlawful action." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 400 (6th Cir. 2016) (citing *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). "A civil conspiracy requires a single plan, where each alleged

coconspirator shares in the general conspiratorial objective, and an overt act committed in furtherance of the conspiracy that causes injury to the plaintiff." *Marvaso v. Sanchez*, 971 F.3d 599, 614 (6th Cir. 2020) (citing *Hooks*, 771 F.2d at 944). To state a conspiracy claim under § 1985(3), Plaintiff must also allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Conspiracy claims "must be pled with some degree of specificity." *Bickerstaff*, 830 F.3d at 400.

Plaintiff alleges the Defendant Officers either conspired together or with prosecutors, ECF No. 1, ¶ 118, to arrest, charge, and prosecute Plaintiff without probable cause, *id.* at ¶ 147, by suppressing the impeaching evidence of Ronald's pending charges and plea deal, *id.* at ¶ 124, and ignoring exculpatory evidence contradicting Ronald's testimony, *id.* at ¶ 140, in violation of Plaintiff's due process rights under §§ 1983, 1985(2), and 1985(3).

### (a)   Intracorporate Conspiracy Doctrine

Defendant Officers Neumann and Heddle note that they were both employed by the same collective entity, the Washtenaw County Sheriff's Department, at the time of the alleged conspiracy. As the Sixth Circuit held, "members of the same legal entity cannot conspire *with one another* as long as their alleged acts were within the scope of their employment." *Jackson v. City of Cleveland*, 925 F.3d 793, 819 (6th Cir. 2019) (citation omitted) (noting that when "all of the defendants [were] members of the

28

same collective entity, there [were] not two separate 'people' to form a conspiracy" under §§ 1983 or 1985).

Plaintiff alleges the Officers "conspired with prosecutors," who are part of a different governmental entity, "to suppress the evidence." ECF No. 1, ¶ 118. While the Defendant Officers take issue with the fact that the prosecutor or the prosecutor's office have not been named as defendants in this case, a defendant may be held liable for having participated in a conspiracy, even though his coconspirators are not defendants to the action. *See, e.g.*, *Kinney v. Anderson Lumber Co., Inc.*, No. 18-5146, 2018 WL 7317203, at *2 (6th Cir. 2018) (evaluating factual sufficiency of § 1983 conspiracy claim between private entities and state court judge who was not named as a defendant due to absolute judicial immunity).

But that does not end the inquiry, since the prosecutors and the officers are all employed by the same entity: Washtenaw County. There is some caselaw in this district suggesting that "sheriffs and prosecutors work for the 'same entity'" for purposes of the intracorporate conspiracy doctrine. *See Desandre v. Cnty. of Oscoda*, No. 20-12209, 2021 WL 3828588, at *6–7 (E.D. Mich. Aug. 27, 2021)(Michelson, J.) (collecting cases); *see also Elersic v. Lake County*, No. 1:03-CV-1338, 2005 WL 1353864, at *4 (N.D. Ohio June 7, 2005) (holding that conspiracy claim would be barred by the intracorporate conspiracy doctrine under federal law because "the Lake County Detectives and Lake County Prosecutors

are all agents of Lake County"). In *Desandre*, the plaintiffs alleged two officers and two prosecutors conspired together to unlawfully arrest them. 2021 WL 3828588, at *2. But because county sheriff's departments and county prosecutor's offices are not legal entities capable of being sued in Michigan, and plaintiffs did not allege that the Michigan legislature intended that either office be an "independent agency," the court found that the two entities were not "independent legal entit[ies]" for purposes of the intracorporate conspiracy doctrine. *Id.* at *7.

This result made particular sense in a smaller county like Oscoda County, with a population of less than 10,000 inhabitants. *Id*. While Washtenaw County is a larger county, it is still relatively small—less than 400,000 inhabitants. Cf. *Blue v. City of New York*, No. 16-CV-9990 (VSB), 2018 WL 2561023, at *10 (S.D.N.Y. June 4, 2018) (finding that the intracorporate conspiracy doctrine did not apply where police officers were New York City employees and district attorneys were New York State employees). The Court finds the reasoning in *Desandre* sound, persuasive, and particularly on point. Therefore, because the prosecutors and officers can be considered part of the "same entity" of Washtenaw County, there can be no conspiracy between them under the intracorporate conspiracy doctrine, unless their alleged acts were "outside the scope of their employment." *Jackson*, 925 F.3d at 819.

Plaintiff explains that he has alleged the officers were acting outside of the scope of their employment because they "sought a

conviction of Mr. Johnson for their own personal or professional benefit." ECF No. 1, ¶ 140. But this allegation is too conclusory to pass muster under the heightened conspiracy pleading standard. Plaintiff did allege there was "significant pressure on law enforcement to identify a suspect," ECF No. 1, ¶ 5, or to "crack down on crime" because of the recent string of robberies, *id.* at ¶ 36, especially "[a]fter a week without any leads" which created "pressure . . . for the WCSD to solve this case," *id.* at ¶ 42. Construing the complaint in the light most favorable to Plaintiff, a reasonable person could infer that given this pressure, the officers saw a *professional* opportunity in Ronald's identification of Ronnell to secure a conviction. But while this conviction would advance their position within WCSD, it would also "further the purposes" of WCSD. *See Jackson*, 925 F.3d at 818. And, the complaint does not provide factual support for the conclusory allegation that the officers sought the conviction for their "personal" benefit. *See Barrow v. City of Hillview, Kentucky*, 775 F. App'x 801, 808 (6th Cir. 2019) (rejecting claim that "acts motivated by personal interests that are within the scope of the defendant's employment are subject to [civil conspiracy] liability"). Thus, the Complaint does not sufficiently allege the officers were acting outside the scope of their employment.

Consequently, the Complaint fails to allege a conspiracy between the Officers. Plaintiff's civil conspiracy claims under §§ 1983 and 1985 must therefore be **DISMISSED** with prejudice.

31

### (b)   Discriminatory Animus

Furthermore, to raise a conspiracy claim under §§ 1985(2) and 1985(3) for deprivation of equal protection of the laws, Plaintiff must allege that there was "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 376 (6th Cir. 2006) (quotations omitted). The Court has scoured the Complaint and it is bare of any allegations of any racial, or other invidious class-based, discriminatory animus behind the conspirators' actions.

While it is undisputed that Ronnell is a Black man, Plaintiff has not alleged his own race, or any other protected class characteristic in the Complaint. *See Kyles v. Cnty. of Oakland*, 725 F. Supp. 3d 692, 704 (E.D. Mich. Mar. 25, 2024)(Berg, J.) (noting that the failure to allege his own membership in a protected class, leaving it to the Court to infer it, "stop[ped] short of the line between possibility and plausibility of entitlement to relief") (citing *Iqbal*, 556 U.S. at 678).

While Plaintiff argues that the existence of "observable discrepancies . . . between Ronnell and the suspect in the footage (e.g., height disparity, different hairlines) shows an animus towards and reckless disregard for making a proper identification," ECF No. 18, PageID.282, he does not allege it shows *discriminatory* animus based on race or membership in a protected class, or that Ronnell was treated

32

differently than a similarly-situated individual of a different race or class.

The Complaint's section titled "Demonstrated Bias Against Mr. Johnson" similarly fails to contain any allegation of discrimination based on race or any other prohibited classification. Even taking as true the allegation that the officers targeted Plaintiff, there is no allegation that they targeted him based on his race or another protected class. Instead, the Complaint alleges a "reckless disregard for the truth" rather than race- or class-based discrimination. ECF No. 1, ¶ 166. It is possible that such reckless disregard was caused by racial- or class-based bias, but Plaintiff has not made that connection in the Complaint.

In his Response, Plaintiff asks the Court to consider data—which he describes as "judicially noticeable materials"—to infer discriminatory animus in this case based on statistics suggesting that WCSD's policing of robbery around the time of Ronnell's arrest, prosecution, and conviction, had a disproportionate impact on Black people in Washtenaw County. Notably, Plaintiff states that of the 151 arrests for robbery made by the WCSD between 2000 and 2010, 106 or just over 70% of the arrestees were Black, while the Washtenaw County population was only 11% Black in 2000 and 12% Black in 2010.

It is true that circumstantial evidence such as "discriminatory conduct, practices, or the existence of significant racially disproportionate impact" may support a finding of discriminatory animus

33

behind the conspirators' actions. *Ready v. Ford Motor Co.*, 848 F.2d 193, 1988 WL 41153, at *4 (6th Cir. 1988). Regardless of whether the Court considers such data, disproportionate impact is only a "starting point" in determining whether invidious discriminatory purpose was a motivating factor and is not sufficient on its own to plausibly allege discriminatory animus. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Majeske v. Fraternal Ord. of Police, Loc. Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996) ("Disparate impact alone does not satisfy the pleading requirements for either § 1983 or § 1985(3)).

Thus, even if the data could plausibly demonstrate how race-based discrimination impacted law enforcement at the time, Defendants argue it does not suffice to allege that racial animus was a motivating factor *behind the officers' actions in this case. See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *In re Flint Water Cases*, 384 F. Supp. 3d 802, 852 (E.D. Mich. Apr. 1, 2019)(Levy, J.), *aff'd and remanded*, 960 F.3d 303 (6th Cir. 2020) ("Plaintiffs possibly show that the impact of historical race discrimination played a role in the Flint Water Crisis, but not that it was a motivating factor."). Defendants' point is well taken: there is no allegation of race-based discrimination motivating the actions of the Officers in this case.

Thus, without "specific instances of racially motivated conduct by the defendants," Plaintiff's § 1985 civil conspiracy claim fails at this stage. *See In re Flint Water Cases*, 84 F. Supp. 3d at 852.

### B. Washtenaw County's Motion to Dismiss (ECF No. 16)

#### 1. *Wrongful Incarceration Compensation Act*

Defendant Washtenaw County seeks the dismissal of the two counts against it on the basis that Plaintiff already accepted compensation under the Wrongful Incarceration Compensation Act ("WICA") and therefore released any other claims he had against the County as a political subdivision of the state.

Plaintiff claims that WICA only bars actions against the County *in state court* since a WICA award "constitutes a complete release of all claims against this state, and is a complete bar to any action in state court by the plaintiff against this state based on the same subject matter," unless the award was procured by fraud. MCL § 691.1755(8).

But Defendant argues the express language of WICA also bars Plaintiff from suing the County *in federal court*, as the Act specifically states that acceptance of an award is not a bar to "any action in federal court against an individual alleged to have been involved in the investigation, prosecution, or conviction that gave rise to the wrongful conviction or imprisonment." *Id.*

The Michigan Supreme Court and the Michigan Court of Appeals have yet to interpret MCL § 691.1755(8)'s release-of-claims provision. But the issue of whether an acceptance of an award under WICA bars claims against the state in federal court has come before the Eastern District of Michigan at least seven times. And in all seven instances,

35

courts held that WICA bars claims against the state in federal court and subsequently dismissed the plaintiffs' claims against the state.[5]

In his response, Plaintiff merely rehashes the same arguments raised by the plaintiffs in those seven cases,[6] while acknowledging that this Court already found that "the plain language of the statute unambiguously bars all claims, even federal ones, against Michigan and

---

[5] *See DeJesus v. Harvey*, No. 22-cv-12879; 2023 WL 4372682, at *4 (E.D. Mich. Jul. 6, 2023)(Kumar, J.) ("[A] WICA-awarded plaintiff [is precluded] from suing the state or any of its political subdivisions in federal court."); *Clark v. Abdallah*, No. 21-10001, 2023 WL 4851410, at *2 (E.D. Mich. Jul. 28, 2023)(Roberts, J.) ("Plaintiffs voluntarily waived their right to sue Inkster in federal court when they entered into stipulated WICA agreements."); *Deering v. Oakland County*, No. 22-cv-11809, 2023 WL 5808831, at *6 (E.D. Mich. Sep. 7, 2023)(Goldsmith, J.) (rejecting Magistrate Ivy's recommendation and dismissing plaintiff's claims against Oakland County because the plaintiff waived said claims when he accepted an award under WICA); *Smith v. County of Wayne*, No. 21-12070, 2023 WL 8788944, at *10 (E.D. Mich. Dec. 19, 2023)(Lawson, J.) (following the decisions in *DeJesus*, *Clark*, and *Deering* and dismissing plaintiffs' claims against municipalities); *Ward v. County of Wayne*, No. 21-cv-12742, 2024 WL 1174555 at *10 (E.D. Mich. Mar. 19, 2024)(Borman, J.) (same); *Kyles v. Oakland County*, 725 F.Supp.3d 692, 714-15 (E.D. Mich. Mar. 25, 2024)(Berg, J.) (same); *Nixon, v. City of Detroit*, No. 2:23-CV11547, 2024 WL 4363117, at *12 (E.D. Mich. Sep. 30, 2024)(DeClercq, J.) ("[A]s is consistent with WICA's plain language, the acceptance of a WICA award bars all claims against the state based on the same subject matter, whether brought in state or federal court.").

[6] Plaintiff similarly rehashes preemption arguments that this Court already considered in *Kyles v. Oakland County* when it held that the WICA release-of-claims provision is not preempted by § 1983. 725 F.Supp.3d at 716-17.

its political subdivisions by plaintiffs who have accepted WICA awards." *Kyles*, 725 F. Supp. 3d at 714.

Plaintiff's only new argument points to proposed state legislation not yet adopted, and as such it is unripe. He highlights that the Michigan House of Representatives recently passed HB 5431, on December 10, 2024, to amend subsection (8) to read that accepting an award "does not operate as a waiver of, or bar to, any action and recovery in federal court against a *political subdivision* or individual…" HB 5431, ECF No. 19-4, PageID.350-51 (emphasis added). Similarly, the amendment would change the definition of "this State" by adding the phrase "[f]or the purpose of state court actions related to this act." *Id.* at PageID.344. While Plaintiff argues that this bill "reflects a clear legislative intent that accepting a WICA award does not waive a *Monell* claim against the County," the bill is currently in committee in the Michigan Senate and has not been passed by that body or signed into law by the Governor.

Thus, under current precedent, Plaintiff's acceptance of the WICA award bars any claims he has against the County in federal court. Because Plaintiff does not allege that his acceptance of the award was fraudulently induced or otherwise involuntary, his acceptance of the WICA award operates as a bar to an action against the County on the same subject-matter in federal court. The claims against the County are hereby **DISMISSED**.

## 2. *Monell Liability*

As an alternative ground, the County also argues Plaintiff failed to state a *Monell* claim against it. Under § 1983 and *Monell*, courts may hold a county liable for a constitutional tort "if the injury is caused by a municipal custom or policy, or if the [county]'s failure to train employees amounts to deliberate indifference to constitutional rights." *Bailey*, 860 F.3d at 388 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).

In this case, as explained above, Plaintiff plausibly alleged that the officers violated *Brady* when they withheld impeachment information from the prosecutor. Plaintiff claims that this constitutional violation was caused by the County's custom of suppressing exculpatory evidence (Count VI) and failure to train the Defendant Officers on their *Brady*-derived obligations (Count VII).[7]

First, Plaintiff argues the constitutional violation in this case was caused by a County "custom of tolerance or acquiescence of federal rights violation." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). To raise such a custom of tolerance claim (also known as "inaction theory"), a plaintiff must allege "(1) the existence of a clear and persistent pattern of violating federal rights . . . ; (2) notice or constructive notice on the part

---

[7] To the extent Plaintiff argues the County failed to train the prosecutors, the allegations in the Complaint only relate to training police officers, not training prosecutors.

38

of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the 'moving force,' or direct causal link for the constitutional deprivation." *Powers v. Hamilton Cnty Pub. Defender Com'n*, 501 F.3d 592, 607 (6th Cir. 2007) (where the public defender's office failed to request indigency hearings).[8]

Plaintiff alleges that through its officers, the County had a "decades-long pattern and practice . . . of suppressing material, exculpatory evidence from the defense or factfinder." ECF No. 1, ¶¶ 170-71. He alleges that at the time of Plaintiff's arrest, the County "had customs and policies to authorize, condone, tolerate, and approve illegal and unconstitutional actions by its [officers]," including, among others, ignoring or withholding evidence to manufacture probable cause or strengthen a case for conviction. *Id.* at ¶ 105.

However, the only factual basis supporting such "inaction theory" is the alleged disclosure violation by the officers in this case, which falls short from suggesting a "clear and persistent pattern" of inaction. *See Powers*, 501 F.3d at 607. A single incident of unconstitutional activity is not enough to establish a government policy, practice, or custom

---

[8] Defendant disputes the standard used by Plaintiff but argues nonetheless that Plaintiff has failed to meet the elements under that standard. ECF No. 21, PageID.374.

39

sufficient to render a municipality liable for damages under § 1983. *See City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Hooper v. City of Detroit*, 50 F. Supp. 2d 689, 691 (E.D. Mich. May 17, 1999)(Gadola, J.) ("[O]ccurrence of a single instance of a constitutional violation by an officer employed by the municipality is insufficient, in and of itself, to show the existence of a municipal policy underlying the violation.").

Second, the failure-to-train claim fails for similar reasons. To allege a failure to train claim, a plaintiff must allege that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citations omitted).

Here, Plaintiff alleged that the County failed to train the Defendant Officers of their obligations:

- "to disclose and produce exculpatory and impeachment evidence to criminal defendants," ECF No. 1, ¶ 179; and,
- "to ensure that exculpatory and impeachment evidence is provided to prosecutors and defense attorneys to prevent wrongful convictions," *id*. at ¶ 105.

But the Complaint also alleges the officers were "experienced, well trained police officers," *id*. at ¶ 115, casting doubt on the sufficiency of the causation element.

Furthermore, Plaintiff conclusively alleges the inadequate training was the result of deliberate indifference because the County was on notice that its employees suppressed material, *id*. at ¶ 177, as there was a "pattern of similar constitutional violations by its officers, *id*. at ¶ 181. A plaintiff may provide "prior instances of unconstitutional conduct demonstrating that the County . . . was clearly on notice that the training . . . was deficient and likely to cause injury but ignored it" to satisfy the deliberate indifference prong. *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). But here, the only instance of unconstitutional conduct alleged in the Complaint with sufficient factual support is the alleged disclosure violation by the officers in this case, which falls short of plausibly alleging a "recurring situation." *Id*. A plaintiff fails to state a *Monell* failure-to-train claim where there is no "particular allegations regarding the training [the defendant] provides . . . other than it must be inadequate given the [alleged violation]." *Estate of Abbey v. Herring*, 598 F. Supp. 3d 572, 590 (E.D. Mich. Apr. 12, 2022)(Drain, J.). Thus, the Court cannot infer inadequate training from the Defendant Officers' alleged unconstitutional actions in this case either.

## IV. CONCLUSION

For the foregoing reasons, the Defendant Officers' Motion to Dismiss (ECF No. 15) is **GRANTED IN PART** and **DENIED IN PART**, and Defendant Washtenaw County's Motion to Dismiss (ECF No. 16) is **GRANTED**. All Counts—except Count I (*Brady* violation) against the Defendant Officers—are hereby **DISMISSED** with prejudice. Washtenaw County is hereby **DISMISSED** from the case.

**SO ORDERED**.

Dated: September 26, 2025          /s/Terrence G. Berg
                                  TERRENCE G. BERG
                                  UNITED STATES DISTRICT JUDGE